## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

ELIAS CHARON

    *Plaintiff,*

*v.*

MARK MUSSELMAN,

VICTOR MORRIS,

TROY BLACK,

AND

CITY OF MURFREESBORO, TENNESSEE.

    *Defendants.*

Case No.

JURY DEMANDED

## COMPLAINT

Comes now the Plaintiff, ELIAS CHARON, by undersigned counsel and for his complaint against the Defendants for damages based on the unfounded institution of criminal charges against him. Plaintiff sues the City of Murfreesboro and Murfreesboro Police Department defendants under 42 U.S.C. § 1983 for Fourth Amendment violations, and Mr. Mark Musselman for the Tennessee tort of malicious prosecution. Plaintiff states the following:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter for the 42 U.S.C. § 1983 claims under 28 U.S.C. § 1331 (federal question) jurisdiction, and for the Tennessee tort claim pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction) and 28 U.S.C. § 1332 (diversity jurisdiction).

2. Jurisdiction of this Court is also invoked under 28 U.S.C. § 1343(a)(3) because this action seeks redress for a deprivation, under color of state law, of rights secured to Plaintiff by the

Fourth Amendment to the Constitution of the United States of America.

3. Plaintiff asserts claims for relief under 42 U.S.C. § 1983, which authorizes action to redress the deprivation, under color of state law, of rights, privileges, or immunities secured to Plaintiff by the Constitution or laws of the United States of America, 42 U.S.C. § 1988, which authorizes the award of attorney's fees and costs to prevailing plaintiffs in actions brought under 42 U.S.C. § 1983, and Tennessee tort law, which recognizes the tort of malicious prosecution.

4. This Court is a proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2) because all defendants reside in this judicial district. Additionally, a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

### PARTIES

5. Plaintiff Elias Charon ("Mr. Charon") is an adult resident of California.

6. Defendant Mark Alan Musselman ("Mr. Musselman") is an adult resident of Murfreesboro, Tennessee.

7. Defendant Victor Morris ("Officer Morris") was at all relevant times a police officer employed by the Murfreesboro Police Department and was acting under color of state law. On information and belief, Morris is a resident of Rutherford County, Tennessee.

8. Defendant Troy Black ("Sergeant Black") was at all relevant times a police officer employed by the Murfreesboro Police Department and was acting under color of state law. On information and belief, Morris is a resident of Rutherford County, Tennessee.

9. Defendant City of Murfreesboro, Tennessee ("Murfreesboro") is the municipal government for Murfreesboro, Tennessee.

10. At all times relevant to this Complaint, all defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to plaintiffs.

2

11. At all times relevant to this Complaint, the City of Murfreesboro, Officer Morris, and Sergeant Black acted under color of state law.

**FACTUAL ALLEGATIONS**

**A. Mr. Charon**

12. Mr. Charon is an experienced, professional dog trainer.

13. In the spring of 2023, Mr. Charon was operating as a mobile dog trainer, driving around the country with a camper to sleep in and providing mobile dog training services.

14. Mr. Charon advertised his dog training services on mobile apps, such as "Tik Tok," through which he would be hired remotely to travel to other locations and provide dog training.

15. Mr. Charon also suffers from complex Post-Traumatic Stress Disorder.

16. Mr. Charon had four well-trained service animals, which he kept with him at all times. Especially because of his mental health condition, Mr. Charon is emotionally interdependent with these well-trained companions.

**B. A Murfreesboro resident hires Mr. Charon to come to her home and train her dogs**

17. In June 2023, a Murfreesboro homeowner by the name of Destinee Abeyta saw Mr. Charon's TikTok advertisement and then hired him to come train her dogs.

18. At the time, Mr. Charon was traveling in Arizona.

19. On June 12, 2023, Mr. Charon arrived in Murfreesboro, Tennessee to train Ms. Abeyta's dogs.

20. Mr. Charon is a relatively slight, non-violent man with no combat training or experience. This is a photo of Mr. Charon on the day of the incident:

3



21. Ms. Abeyta lived on a residential street called Salem Glenn Crossing.

22. Mr. Musselman, another resident of Salem Glenn Crossing, was at the time well known in his neighborhood as a dog-hating bully.

### C. Mr. Musselman – the neighborhood bully

23. Mr. Musselman, a former marine, lived on Salem Glenn Crossing with his wife, two daughters, and son.

24. This is a picture of Mr. Musselman from the day of the incident in question:



25. Mr. Musselman routinely made himself and his physical power visible to the neighbors by lifting weights in his garage with the garage door open.

26. Mr. Musselman had been routinely intimidating and frightening his neighbors and their guests for years – particularly women, and often elderly women – because he did not like their dogs.

27. For instance, in 2020 a dog left a tiny piece of poop on the strip of grass between the sidewalk and the curb in front of Musselman's property. Musselman reacted by posting the following on the neighborhood Facebook page:

> **My name is Mark Musselman of 2417 Salem Glen Xing. Who wants to confess to being the scumbag who's incapable of taking care of their fleabag canine? I've got some news for whoever it is, you'd better fix this now before I do!**

28. On another occasion prior to June 2023, Musselman had aggressively confronted Ms. Abeyta's 80-year-old mother because her dog urinated on Musselman's plants during a walk. Musselman reacted by coming out of his house and *chasing* the elderly woman away, terrifying her.

29. Another Salem Glen resident, Ms. Justine Guillen had seen Musselman act aggressively toward neighbors before. Ms. Guillen had seen Musselman "puff up like he's about to hit someone." Ms. Guillen would later describe Musselman to the police as "aggressive in nature with his body language," and "very frightening."

30. In Ms. Guillen's personal experience, Musselman had "pounded on her door one day" merely because her grandmother's dog had urinated on Musselman's mailbox. When Ms. Guillen tried to talk to him Musselman became "super aggressive" toward her, and she ended up closing the door on him

31. Ms. Guillen was also aware that Musselman had been involved with multiple other conflicts with neighbors. Ms. Guillen would later tell police that Musselman "knocked on people's doors searching for issues to be had with neighbors for petty things."

6

32.     Ms. Guillen would also relate to police that Musselman "is known to harass elderly women, terrorize animals, and generally be disagreeable and confrontational within the neighborhood." Ms. Guillen would emphasize that Musselman "is highly aggressive, even towards the elderly members of the community."

33.     On information and belief, within Musselman's family his oldest daughter, a teenager, routinely played the role of placating her father, keeping her younger siblings in line, and generally doing what she could to avoid her father's anger from being triggered.

34.     Mr. Musselman had his daughters create an "anti-poop" sign for their mailbox, and posted it on the mailbox:



### D. Musselman rushes and terrifies Mr. Charon

35. On June 12, 2023, Mr. Charon arrived at Ms. Abeyta's home, parked his trailer on the street, and began unpacking his four service dogs.

36. Ms. Abeyta came out to the street, to Mr. Charon's camper, to greet Mr. Charon.

37. Mr. Charon had three of his dogs on leashes while the fourth, his elderly black labrador named "Ragnar," was not yet leashed.

38. Ragnar, a particularly well-trained older lab, was behaving himself well and calmly.

39. In the meantime, Musselman and his three children were on a walk around the neighborhood.

40. During these walks, Musselman had his kids do sets of laps around Salem Glen Crossing.

41. That day they had already completed four laps and were in the midst of completing their final, fifth lap.

42. One of Mr. Musselman's children, a middle-school aged daughter, approached Ragnar to pet him.

43. Ragnar, a gentle dog who loves children, happily greeted Musselman's daughter. Ragnar did nothing that was the least bit aggressive such as lunging, growling, or snapping.

44. However, Mr. Musselman suddenly freaked out.

45. First, Musselman believed that Ragnar was Ms. Abeyta's dog, and Musselman aggressively got in Ms. Abeyta's space as if he was going to attack her.

46. Mr. Charon explained that Ragnar was his, and then Musselman redirected at him.

47. Musselman was yelling at Mr. Charon to keep his dog away from Musselman's child, and yelling that "your dog should be on a fucking leash."

48. Mr. Charon replied, "Hold on dude, I got him."

49. Musselman then attempted to kick Ragnar.

50. Mr. Charon told Musselman, "You better not kick my fucking dog. He is an old dog, he is harmless, just chill out."

51. Musselman aggressively got in Mr. Charon's face, puffing up as if about to attack Mr. Charon just as the neighbors had seen him do on many prior occasions.

52. Mr. Charon repeatedly asked Musselman to back off; however, Musselman continued aggressively getting in his face, yelling curses at him and Ragnar.

53. Mr. Charon became terrified that Musselman was about to attack him.

54. Mr. Charon pulled his handgun from its concealed holster secured inside the lining of his pants to deter Mussleman from physically attacking him.

55. However, Mr. Charon never pointed the gun at Musselman or anyone else.

56. Musselman saw the gun and backed away.

57. Musselman and his children returned to completing their exercise "lap" around Salem Glenn Crossing, completing their lap before heading back to their home.

58. Musselman never saw Mr. Charon point the gun at him, and was never in fear that he was imminently about to be shot.

59. Ms. Guillen, from inside her home, heard the commotion from the confrontation and came out to see what was happening.

60. Once she got outside, she saw that it was Musselman in another conflict.

61. Familiar with Musselman's history of aggression, Ms. Guillen was concerned for Mr. Charon's safety – not Musselman's.

62. Ms. Guillen stayed with Mr. Charon, and explained to him about Musselman's history

of bullying.

63. Mr. Charon called 911 to report Musselman's aggressive behavior.

64. A few minutes later, Musselman came back walking toward Mr. Charon's camper. This time, he did not bring his children with him.

65. Musselman had called the non-emergency Murfreesboro police department number, and was on the phone with a dispatcher reporting Mr. Charon for having a gun.

66. Musselman approached Mr. Charon *again* while on this call, coming within about twenty feet of him.

67. Mr. Charon got out his cell phone and started recording video of Musselman.

68. Mr. Charon put his gun in his vehicle while Musselman was on the phone.

69. Musselman and Mr. Charon exchanged words a few times during the call.

70. The dispatcher repeatedly had to redirect Musselman to not engage with Mr. Charon, and to back away from the situation and let law enforcement handle it.

### E. Murfreesboro Police Department arrests and charges Mr. Charon

71. Murfreesboro Police Department dispatched Officer Morris, Sergeant Black, and another officer – Officer Ashley Mellinger – to respond to Musselman's call.

72. The officers interviewed Musselman, Musselman's teenaged daughter, Mr. Charon, Ms. Guillen, and several other neighbors.

73. Mr. Charon fully cooperated with the officers, and honestly told them that he had displayed the firearm because Musselman threatened him. However, Charon also explained that he had never pointed it at Musselman or his children.

74. Musselman likewise told the officers that Mr. Charon never pointed the gun at him or his children.

75. Nonetheless, Musselman asked for Mr. Charon to be arrested and charged for assault, merely for displaying the gun.

76. Officer Morris interviewed Musselman's teenaged daughter separately. Musselman's daughter admitted that she had not really seen what happened between Mr. Charon and her father because, according to her, she was trying to get her siblings out of the situation once it escalated. However, Musselman's daughter then claimed that Mr. Charon had in fact pointed the gun at her father and at her younger brother.

77. Musselman's daughter was visibly anxious during this interview, contradicting herself and seemingly trying to find the "right" things to say to support her father. It was apparent to anyone watching this interview, which was recorded on Morris's body camera, that she was lying out of a sense of duty to her father.

78. Ms. Guillen and several other neighbors explained to the officers about Musselman's history of aggressively bullying his neighbors and their guests, about his targeting of weaker individuals such as elderly women, and about his bizarre hostility to dogs.

79. One of the neighbors, a woman who was watching from a distance, gave an outlier account that did not match Musselman's, Musselman's daughter's, the other neighbors', or Mr. Charon's. In this outlier account, Mr. Charon did not pull the gun out until the *second* encounter, when Musselman came back without his children. This neighbor also stated that Musselman aggressively threatened Mr. Charon to the point where if Musselman had done that to her, she would have shot him. This neighbor went on to say that Mr. Charon *did* point the gun at Musselman during this second encounter, and kept it pointed at him while he backed off.

80. The allegation that Mr. Charon pointed the gun at Musselman during the second encounter was plainly incorrect, since this would have been when Ms. Guillen was there and during

the time that Musselman was speaking with MPD dispatch.

81.     On information and belief, this neighbor mistook Mr. Charon's cell phone, which Mr. Charon pointed toward Musselman to record him, for a gun.

82.     The officers did not attempt to identify or obtain any surveillance footage from the neighborhood, such as "Ring" cameras that may well have recorded the incident.

83.     Notwithstanding the numerous neighbor statements corroborating the fact that Mr. Charon had only displayed the firearm because Musselman was threatening him, and notwithstanding the obvious and apparent reasons to recognize that Musselman's daughter's account – which was contradicted by even Musselman's – was false, Officer Morris and Sergeant Black made the decision to arrest and criminally charge Mr. Charon with two counts felony aggravated assault.

84.     Before making this decision, Sergeant Black consulted with another Murfreesboro Police Department official who endorsed the decision to arrest and charge.

85.     When the officers informed Mr. Charon that he was being arrested and charged, he experienced a panic attack because he would be separated from his service animals.

86.     Because of this panic attack, officers ended up having to take Mr. Charon to the hospital before taking him to jail.

87.     Upon taking Mr. Charon to jail, Officer Morris swore out warrants charging Mr. Charon with two counts of felony aggravated assault.

88.     Morris's warrants represented Mr. Charon as the aggressor in the situation, presenting the most damning narrative possible without acknowledging the numerous neighbor accounts corroborating the conclusion that Musselman was the aggressor and Mr. Charon was the victim.

89.     Morris's warrant affidavit also failed to acknowledge the severe inconsistencies between the incriminatory statements, or the obvious reasons that Musselman's daughter had to lie.

13

90. Morris's warrant also failed to acknowledge that Mr. Charon had called 911, while Musselman had called only the non-emergency number.

91. Morris's warrant also failed to acknowledge that Musselman went back to confront Mr. Charon again, and that Musselman had to be redirected by the dispatcher to stop talking to him.

92. Morris's warrant failed to acknowledge the obvious defects with the outlier neighbor's account, such as that she claimed that the gun came out during the *second* encounter, and failed to acknowledge her statement that Musselman was so aggressive that if he had behaved that way with her she would have actually shot him.

93. Defendant Morris knowingly and recklessly made the above material omissions.

94. If Morris's warrant had truthfully represented the exculpatory information that he and the other officers were made aware of, there would not have been probable cause for the charges.

95. However, because of Morris's biased warrant affidavit Mr. Charon was charged with two counts of felony aggravated assault – one with Musselman as alleged victim, one with Musselman's son as alleged victim.

### F. Mr. Charon contests and defeats the false charges

96. After being charged and incarcerated in the Rutherford County jail, Mr. Charon was ultimately able to bond out.

97. Mr. Charon retained criminal defense counsels, and fought the charges.

98. Mr. Charon submitted a complaint to MPD and other entities, however, upon review MPD endorsed the unwarranted arrest and charges.

99. Mr. Charon fought the false charges for over two full years, traveling from his home in California to attend numerous court dates in Murfreesboro and spending many thousands of dollars on criminal defense attorney fees.

100. Mr. Charon experienced enormous psychological distress because of the pending criminal charges, constantly fearing that he would be unjustly convicted and permanently separated from his service animals.

101. In August 2025, Mr. Charon finally got his jury trial.

102. The jury deliberations took all of half an hour, resulting in a swift "not guilty" verdict.

## Count I
## MALICIOUS PROSECUTION IN VIOLATION OF THE FOURTH AMENDMENT
### 42. U.S.C. § 1983
### (Defendants Murfreesboro, Morris, and Black)

103. Plaintiff hereby reincorporates paragraphs 1 – 102 by reference.

104. On June 12, 2023, Defendant Morris falsely charged Plaintiff Charon with two counts of Aggravated Assault.

105. Defendant Black, a sergeant who outranked Morris, participated in and approved of the decision to charge Mr. Charon criminally.

106. Before the arrest, Black consulted with another MPD official regarding the charges who endorsed that they should be filed, even after being made aware of the neighbor statements indicating that Mr. Charon was the victim while Musselman was the aggressor. On information and belief, the concurrence of these higher ranking MPD officers demonstrates an MPD policy and/or custom of disregarding exculpatory statements supporting a claim that a firearm was displayed in self-defense in favor of initiating criminal charges without probable cause.

107. In addition, the MPD officers' choice to curate the narrative that most favored Musselman over Mr. Charon is indicative of a policy or custom of discriminating against non-residents in favor of locals.

108. The false charges deprived Mr. Charon of his liberty by causing him to be jailed,

subjecting him to release conditions, and subjecting him to criminal charges and court appearances.

109. Defendants were operating under the color of state law when they initiated the false charges against Plaintiff Charon.

110. Defendants charged Plaintiff Charon without probable cause that Plaintiff Charon was guilty of any offense.

111. Defendant Morris recklessly or intentionally omitted material exculpatory information from the affidavit of probable cause, including, but not limited to, the fact that Defendant Musselman initiated and escalated the confrontation, that witnesses described Musselman as the aggressor, the witnesses' description of Musselman's history of hostile interactions with neighbors, and the exculpatory witness statements corroborating Mr. Charon's account, which was also Musselman's own account, that no firearm was ever pointed at Musselman or his children.

112. The false charges were ultimately resolved in Mr. Charon's favor, with a "not guilty" jury verdict.

113. As a direct and proximate result of the Defendants' malicious prosecution, Plaintiff suffered a deprivation of liberty, emotional distress, physical distress, and massive financial damages in the form of attorney's fees, bond money, lost income, and medical costs.

**Count II**
**COMMON LAW MALICOUS PROSECUTION**
**(Defendant Musselman)**

114. Plaintiff hereby reincorporates paragraphs 1 – 102 by reference.

115. "To state a claim for malicious prosecution, a plaintiff must show that the defendant (1) instituted a proceeding against him 'without probable cause,' (2) 'with malice,' and (3) that the proceeding 'terminated in the plaintiff's favor.' *Mynatt v. Nat'l Treasury Emps. Union, Chapter 39*, 669 S.W.3d 741, 746 (Tenn. 2023).

16

116. On Jun 12, 2023, Defendant Musselman initiated a criminal prosecution against Plaintiff Charon for the Tennessee offense of Aggravated Assault.

117. Defendant Musselman did so without probable cause to believe that Plaintiff had committed the alleged offense.

118. Defendant Musselman acted with malice in initiating and continuing the criminal prosecution against Plaintiff.

119. Musselman was himself the aggressor in the encounter, forcing Mr. Charon to feel that he needed to display the firearm to defend himself.

120. Musselman knew that Mr. Charon had never pointed the gun at him and never felt any fear at all, much less an objectively reasonable fear, that Mr. Charon was going to shoot him.

121. The criminal proceedings were terminated in Plaintiff Charon's favor on August 20, 2025, when the jury found him "not guilty."

122. As a direct and proximate result of Defendant Musselman's actions, Plaintiff suffered damages, including loss of liberty, attorney's fees and legal expenses, emotional distress, reputational harm, and other consequential damages.

123. Musselman acted intentionally and with wanton disregard for Mr. Charon by seeking the initiation of the felony charges without probable cause.

## REQUEST FOR RELIEF

Based upon all of the foregoing, Plaintiff Charon requests:

I.     Process be issued and that each Defendant be required to respond within the time provided by the Federal Rules of Civil Procedure;

II.    A jury be empaneled to try this case;

III.   That Plaintiff Charon be awarded nominal damages;

IV.    That Plaintiff Charon be awarded compensatory damages in the amount to be determined by a jury;

V.     That Plaintiff Charon be awarded punitive damages in an amount to be determined by a jury;

VI.    That Plaintiff Charon be awarded reasonable attorney's fees, costs, and expenses under 42 U.S.C. § 1988;

VII.   For pre- and post-judgment interest on all damages awarded;

VIII.  For such other, further, and general relief as the Court deems just and appropriate.

Respectfully submitted,

*/s Kyle Mothershead*
Kyle Mothershead, BPR 22953
Relentless Advocacy, PLLC
7000 Executive Center Drive, Suite 240
Brentwood, TN 37027
T: (615) 891-3901 / F: (615) 229-6387
E: kyle@relentlesslaw.com

Paul D. Randolph III, #39667
BRAZIL CLARK, PLLC
760 E Argyle Ave.
Nashville, TN 37203
615-730-8619
615-634-3651 (fax)
paul@brazilclark.com

18